**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


JOSEPH B. WATERS,

     Petitioner,

v.                                                                          No. 2:22-cv-926 MV/KRS

FNU STEVENSON *Warden*, and
ATTORNEY GENERAL OF THE
STATE OF NEW MEXICO,

     Respondents.[1]


**MEMORANDUM OPINION AND ORDER**

     **THIS MATTER** is before the Court on Joseph B. Water's ("Petitioner") Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (", filed December 5, 2022 ("Habeas Petition").[2] (Doc. 1). The Attorney General of the State of New Mexico and FNU Stevenson Warden (collectively "Respondents") filed an answer, as ordered by the Court. (*See* Docs. 10, 12, 14, 18, 20, 21). Petitioner did not file a reply.[3] Having considered the parties' submissions, the relevant law, and the record in this case, Petitioner's Habeas Petition is

---

[1] Petitioner is in custody under a state-court judgment. He was incarcerated at Lea County Correctional Center in Hobbs, New Mexico at the time of his filing. *See* (Doc. 15) at 1. Petitioner is presently incarcerated at Guadalupe County Correctional Facility ("GCCF") in Santa Rosa, New Mexico. *See* https://www.cd.nm.gov/offender-search/ (last accessed February 27, 2026). The warden of GCCF, Matt Montoya, and the Attorney General of the State of New Mexico are thus proper party respondents in this Section 2254 habeas proceeding. *See* Habeas Corpus Rule 2(a) ("If the petitioner is currently in custody under a state-court judgment, the petition must name as respondent the state officer who has custody."). The warden of GCCF is therefore substituted in place of FNU Stevenson Warden as a party respondent in this Section 2254 habeas proceeding.

[2] On June 5, 2024, the Court adopted the April 25, 2024, Proposed Findings and Recommended Disposition, (Doc. 15), finding Petitioner filed a mixed petition containing both exhausted and unexhausted claims. (Doc. 18). Subsequently, on May 9, 2024, Petitioner voluntarily withdrew his unexhausted claims. (*See* Docs. 17, 18). Accordingly, only the following claims are at issue: (1) ineffective assistance of counsel based on trial counsel's failure to suppress Petitioner's non-Mirandized statements to law enforcement, advice to decline the State's plea offer, failure to investigate Petitioner's defenses and witnesses, failure to call witnesses and rebuttal expert witnesses (sub-claims 1(b) – (f)), and double jeopardy (Ground 3).

[3] Pursuant to 28 U.S. Code § 226(b)(2) this Court afforded Petitioner more than 595 days to file a reply. After an extensive review of the record, the Court finds that it has sufficient information to issue this Order to avoid further delay.

1

DENIED.[4]

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On April 29, 2015, a jury found Petitioner guilty of first-degree kidnapping; first-degree criminal sexual penetration ("CSP"); third-degree aggravated battery; and the misdemeanor offense of interference with communications.[5] (Doc. 21-1 at 5-8, 14, 16). The jury found Petitioner not guilty as to the five remaining counts of first-degree CSP and one count of fourth-degree contributing to the delinquency of a minor. (*Id.* at 9-13, 15).

Petitioner's convictions stemmed from the kidnapping and sexual assault of Petitioner's then-girlfriend's 15-year-old daughter, A.A., on November 4, 2013. (*See* Doc. 21-1 at 1-3, 32-44). At trial, prosecutors alleged that Petitioner and A.A. drove to a nearby gas station to buy fuel for a generator for Petitioner's trailer and, during the return trip to the trailer, Petitioner deviated from the route to the trailer and repeatedly sexually assaulted and battered A.A. over the course of seven to eight hours. (*Id.*); (Doc. 23-1 at 45-62). On September 2, 2015, Petitioner was sentenced to a 39-year, 364-day term of imprisonment. (*See* Doc. 21-1 at 17–22).

### A.    State District Court

Prior to trial, Petitioner rejected a plea agreement to reduced charges with a sentence ranging from 3 years to a cap of 18 years. (Doc. 21-1 at 325-26, 182); *see also* (*Id.* at 351-59).

---

[4]   On May 6, 2024, this Court referred this matter to Magistrate Judge Kevin R. Sweazea in accordance with the provisions of 28 U.S.C. §§ 636(b)(1)(B), (b)(3). (Doc. 16). In the interest of judicial efficiency, this Court will resolve Plaintiff's Habeas Petition at this time without first awaiting a recommendation by Magistrate Judge Sweazea. *See Liverman v. Comm. on the Judiciary, U.S. House of Representatives*, 51 F. App'x 825, 827 (10th Cir. 2002) ("Implicit in a district court's discretionary authority under 28 U.S.C. § 636(b)(1)(B) to refer a matter to a magistrate is the power to withdraw a reference. *Cf.* 28 U.S.C. § 636(c)(4) (permitting withdraw of reference by district court in consent cases). Moreover, nothing in Section 636 suggests that a district judge is constrained to act on a motion pending before the court until the magistrate has issued a recommendation."). Nothing in this Memorandum Opinion and Order overturns this Court's May 6, 2024, Order of Reference Relating to Prisoner Cases (Doc. 16).

[5] Except as otherwise noted, all record citations are to the exhibits attached to Respondents' Answer, (Doc. 21). The Court cites to the CM/ECF pagination rather than any internal page numbers in the exhibits.

During the trial scheduling conference, Petitioner's trial counsel informed the trial court that Petitioner "informed me that he wishes me to ready myself for trial." (*Id.* at 326). Petitioner did not raise any concerns or questions regarding the plea agreement or his counsel's statement to the trial court. (*Id.*)

At trial, A.A. testified that during the evening of November 4, 2013, she drove with Petitioner to a nearby gas station to obtain fuel for the generator for Petitioner's trailer. (Doc. 23-1 at 45-47). While at the gas station, A.A. encountered her friend Ramon with whom she chatted with prior to her getting back in Petitioner's vehicle to drive back to Petitioner's trailer. (*Id.* at 47-48). During the return drive, A.A. realized Petitioner had not taken the correct route back to the trailer. (*Id.* at 48). Shortly thereafter, Petitioner pulled over his vehicle to the side of the road, reached out, and grabbed A.A.'s breast. (*Id.* at 50-51). A.A. testified that she smacked Petitioner's hand away to which he responded, "I was just testing you." (*Id.*) Petitioner then began driving again, but stopped on the side of the road and attempted to "make a move" on A.A. (*Id.* at 51-52). In response, she pushed Petitioner away and, as she opened the passenger door, she fell out of the vehicle and landed on the ground. (*Id.* at 52). Petitioner exited the vehicle, "got on top of" her, tore off her clothes, ripped her bra in two down the middle, and vaginally penetrated her without consent. (*Id.* at 52-54). A.A. testified that, prior to the rape, she screamed for help and attempted to fight Petitioner. (*Id.* at 53). He told her, "Nobody can hear you out here," he hit her in the head with a closed fist, and attempted to choke her. (*Id.*) After the initial encounter, Petitioner "forced" A.A. to get back into the vehicle and proceeded to penetrate her anally. (*Id.* at 55). Petitioner then allowed her to redress, but only after Petitioner "made" her perform cunnilingus. (*Id.* at 55-56). She further testified Petitioner stopped the vehicle "multiple times" to rape her. (*Id.* at 56-63, 67). After some time, A.A. convinced Petitioner to let her drive the vehicle to the ranch. (*Id.* at 62).

Eventually, A.A. and Petitioner returned to his trailer where A.A.'s mother, Paula,[6] was waiting from them. (*Id.* at 67-68). Upon her return to the trailer, A.A. showed Paula her cut lip and asked if they could leave immediately. (*Id.*) While driving home, A.A. showed Paula her torn bra and told her Petitioner raped her. (*Id.* at 68-69). Paula called 9-1-1 once they arrived home. (*Id.* at 70).

On the morning of November 5, 2013, Valencia County Sheriff's Office ("VCSO") Detectives James Harris ("Detective Harris") and Curtis Espinosa ("Detective Espinosa") (collectively the "Detectives") approached Petitioner while he was on horseback corralling cows at the ranch. (Doc. 22-1 at 17-18, 76-77, 214). The Detectives identified themselves as officers. (*Id.* at 214-15); (Doc. 22-1 at 18); (Doc. 23-1 at 173). At that time, Detective Harris noticed a knife in Petitioner's front pocket and told Petitioner he was going to remove it for everyone's safety. (*Id.* at 214-15); (Doc. 22-1 at 18); (Doc. 23-1 at 173).

Detective Harris then asked Petitioner if he knew Paula, A.A., and if Petitioner was with them the prior night. (Doc. 21-1 at 215-16). Petitioner confirmed he was with them, that A.A. and he drove to the store together, and the entire drive was approximately 20 minutes. (*Id.*) The Detectives informed Petitioner of the allegations against him and that A.A. was being examined at a Rape Crisis Center. (*Id.* at 221-22). Petitioner admitted to having a "couple beers" and ingesting prescription painkillers the prior night. (*Id.* at 224-25). He, however, denied "do[ing] anything" to A.A., being with her for seven hours, having any sexual intercourse with A.A., and stated he would be willing to take a polygraph test. (*Id.* at 223, 225, 232, 236-38). Ultimately, Petitioner told the Detectives that he and A.A. had sex, but he "thought she was old enough, and something happened, and that was it." (*Id.* at 240). Petitioner explained A.A. told him she was "17 or 18," but after the

---

[6] The Court intentionally omits Paula's last name in the interest of the privacy of the minor victim, A.A.

drive to the store he learned she was 15 years old. (*Id.* at 227-28, 240-41). Detective Harris then told Petitioner was "not under arrest right now . . . but because now that we have gotten to some truth in this conversation . . . I'm going to advise you of your *Miranda* rights." (*Id.* at 242). Petitioner confirmed he understood his rights, and when Detective Harris asked if he was "willing to continue this conversation," Petitioner replied, "[w]e can talk." (*Id.* at 242-43).

The Detectives subsequently asked Petitioner if he would be willing to continue the conversation at sheriff's office. (*Id.* at 243-46, 250-51); (Doc. 23-1 at 173-74). Petitioner stated yes and asked if he could drive himself.  (Doc. 21-1 at 243-46, 250-51); (Doc. 23-1 at 173-74). Detectives agreed to let Petitioner drive himself to the sheriff's office for an interview. (Doc. 21-1 at 243-46, 250-51); (Doc. 23-1 at 173-74). Petitioner, however, later called the Detectives to request a ride to the sheriff's office. (Doc. 21-1 at 251); (Doc. 23-1 at 174). The Detectives returned to the ranch, picked up Petitioner, and drove him to their office. (Doc. 21-1 at 251); (Doc. 23-1 at 174). Once at the office, Detective Harris reread Petitioner his *Miranda* rights. (Doc. 21-1 at 251-52). Detective Harris asked Petitioner if he understood his rights. (*Id.* at 252). Petitioner confirmed he understood his rights and signed a statement waiving his rights. (*Id.*) During the interview, Petitioner claimed A.A. initiated sex on the drive back to the trailer, told him she was 18 years old, and became upset when he stopped the sexual encounter after five minutes. (*Id.* at 261-62). He denied being "rough" with A.A., ripping her bra, or causing any physical harm to her. (*Id.* at 263-278). He further claimed A.A. initiated oral sex and they only had vaginal sex once. (*Id.*at 264). Petitioner also stated, "if I had known she was young, I wouldn't have done anything," and shortly thereafter requested an attorney. (*Id.* at 277-78). Detective Harris then placed Petitioner under arrest for criminal sexual penetration. (*Id.* at 278-79).

Contemporaneously, A.A. underwent a full medical evaluation with Sexual Assault Nurse

Examiner ("SANE") Debbie Acree ("Nurse Acree"). (Doc. 23-1 at 234-35, 238). At trial, Nurse Acree testified she had almost nine years of experience with Alburquerque SANE Collaborative, conducted 300 sexual assault examinations, and was a qualified expert in forensic analysis of rape victims. (*Id.* at 233-34, 266). She testified that she documented 41 injuries to A.A.'s body during the medical examination. (*Id.* at 242). Nurse Acree detailed the location, extent of each injury, and the type of injury (abrasion or bruise). (*Id.* at 244-59). She further testified that she took swabs of A.A.'s neck, breasts, and vaginal area. (*Id.* at 259-60). Nurse Acree also documented multiple injuries and tears to A.A.'s vaginal area and anus. (*Id.* at 262-63). Based on her examination and A.A.'s narrative, Nurse Acree opined that the incident "was not a consensual act." (*Id.* at 265-66). Nevertheless, she admitted she could not opine on whether A.A. "was definitely sexually assaulted" or that the injuries were "consistent with rape." (*Id.* at 264-65).

It is undisputed that the swabs and samples Nurse Acree collected and the clothes A.A. wore during the incident were collected and placed in a SANE kit that was provided to Deborah Hall ("Ms. Hall"), VCSO evidence custodian, who prepared an evidence submission form for the state forensics laboratory. (*Id.* at 191-93, 220). Ms. Hall testified that when she completed the evidence submission form associated with the SANE kit she inadvertently typed the wrong name of the suspect. (*Id.* at 194-95). She typed "Waters, Dominic" instead of "Waters, Joseph" on the form as the suspect's name. (*Id.* at 195, 221-22). Ms. Hall did not file an amended report correcting the suspect's name. (*Id.* at 196); (Doc. 21-1 at 177-78). She did, however, email the state forensics laboratory clarifying the suspect's name as "Joseph Waters" and the corresponding case number. (Doc. 23-1 at 197).

Next, Cynthia Wood ("Ms. Wood"), DNA analyst at the state forensics laboratory, testified that she received the SANE kit from Ms. Hall. (*Id.* at 218-20). Ms. Wood testified that male DNA

was detected on the items in the SANE kit, however, the small quantities were insufficient for testing. (*Id.* at 225-26). Moreover, Ms. Wood stated that she would normally receive a DNA standard, or swabbing from inside the suspect's mouth, but that did not occur in this case. (*Id.* at 228-29).

At trial, Petitioner's trial counsel moved for a directed verdict arguing that insufficient evidence was presented to prove beyond a reasonable doubt the essential elements of Counts 5 (CSP in the First Degree), 6 (CSP in the First Degree), and 7 (CSP in the First Degree). (*Id.* at 279-80); (Doc. 21-1 at 2). The trial court denied the motion. (Doc. 23-1 at 281). The defense then rested without calling any witness. (*Id.* at 282).

The jury found Petitioner guilty of first-degree kidnapping (Count 1), first-degree CSP (Count 2), aggravated battery (Count 8), and the misdemeanor of interference with communications (Count 10). (Doc. 21-1 at 5-8, 14, 16). The jury rendered not guilty verdicts on five counts of first-degree CSP (Counts 3, 4, 5, 6, 7), and contributing to the delinquency of a minor (Count 9). (*Id.* at 9-13, 15). On September 2, 2015, the trial court imposed a period of incarceration of 39 years, 356 days. (*Id.* at 17-22).

### B.    <u>Direct Appeal</u>

On September 16, 2015, Petitioner filed an appeal to the New Mexico Court of Appeals on the basis that there was insufficient evidence to support his conviction. (Doc. 21-1 at 23-25, 32-46). On January 29, 2016, the New Mexico Court of Appeals proposed summary affirmance. (Doc. 21-1 at 47-55, 92-100). Subsequently, Petitioner opposed the summary affirmance and moved to amend the docketing statement. (*Id.* at 56-79). Petitioner filed a memorandum in opposition arguing, in relevant part, a violation of Double Jeopardy rights and failure to suppress non-*Mirandarized* statements. (*Id.* at 63-68, 77-79). The Court of Appeals denied Petitioner's motion

to amend and affirmed his conviction. (*Id.* at 80-91). Thereafter, on June 1, 2016, Petitioner filed a petition for writ of certiorari. (*Id.* at 101-117). On June 22, 2016, the New Mexico Supreme Court denied the petition. (*Id.* at 118-119).

### C.    State Habeas Petition

On May 15, 2017, Petitioner filed a *pro se* petition for writ of habeas corpus relief in state court pursuant to Rule 5-802 NMRA. (*Id.* at 120-56). Petitioner raised the following arguments reiterating his double jeopardy, sufficiency of the evidence, due process, and speedy trial claims. (*Id.*) Petitioner also raised a claim for ineffective assistance of counsel. In particular, Petitioner alleged his counsel was ineffective for: a) "[P]etitioner was denied his right to take the stand in his own defense by his attorney;" b) failing to investigate defenses and witnesses, including hiring a rebuttal expert; c) failing to properly cross-examine and impeach State witnesses; d) failing to suppress inadequately cross-examining witnesses; e) failing to move to suppress DNA evidence; and f) failing to advise Petitioner of a plea offer. (*Id.* at 120-29).

On June 27, 2018, Petitioner, through appointed counsel, filed an amended petition of habeas corpus[7] raising the following issues:

1.    Ineffective Assistance of Counsel: (a) failing to move to suppress the incriminating statement Petitioner provided to law enforcement; (b) preventing Petitioner from exercising his constitutional right to testify in his own defense; and (c) advising Petitioner to decline the State's plea offer, (*id.* at 167-72);

2.    Illegal Conviction: Petitioner's conviction for first degree kidnapping was illegal because the physical force during the kidnapping was merely incidental to the commission of a separate felony, (*id.* at 168, 173-74); and

---

[7] (Doc. 21-1 at 161-76).

3.      Double Jeopardy: convictions for first degree CSP based upon great bodily harm

and aggravated battery violated his right to be free from double jeopardy, (*id.* at

168, 174).

In response to Petitioner's amended habeas corpus petition, the government filed stenographic transcripts of Petitioner's recorded statements to Detectives during the initial field contact and at the sheriff's station. (*Id.* at 213-89). The government alleged the statements demonstrated Petitioner was advised of his *Miranda* rights during both encounters and twice he waived those rights. (*Id.* at 242-43, 251-52). In supplemental briefing, Petitioner's habeas counsel argued Petitioner's *Miranda* waivers were involuntary because he "was confused about the line of questioning [and] was under the influence of prescription medication and alcohol at the time of questioning." (*Id.* at 291, 295).

After extensive briefing, the state court held an evidentiary hearing on February 9, 2022, on Petitioner's amended petition for writ of habeas corpus.[8] (*Id.* at 432). At the hearing, Petitioner withdrew his claims as to an illegal conviction for first degree kidnapping and double jeopardy. (*Id.*) Petitioner also testified that he was advised not to take a plea because the State lacked any DNA tying him to the incident. (Doc. 22-1 at 35-39). And, absent that representation by defense counsel he would have taken the plea to avoid taking a "chance" at trial. (*Id.* at 39). He also claimed Detectives were "real rough" during the initial field interview, did not feel like he could leave the interview, and was not advised of his *Miranda* rights. (*Id.* at 18-20, 24). Petitioner further testified that he was extremely intoxicated on November 5, 2013, and the Detectives were aware of his inebriation. (*Id.* at 21-24). As a result, Petitioner was confused by the line of questioning and thought Detectives were inquiring about his sexual relationship with Paula, not A.A. (*Id.*)

---

[8] Petitioner's trial counsel passed away prior to the evidentiary hearing and thus was unable to testify. (Doc. 21-1 at 433).

On June 23, 2022, the state court denied the petition as to the remaining issues. (Doc. 21-1 at 432-48). Specifically, the state court found that the transcripts and audio recordings of Plaintiff's initial contact with the Detectives at the ranch demonstrated he "was advised of and waived his *Miranda* rights near the end of the interview." (*Id.* at 434). Nevertheless, Petitioner agreed to continue speaking with the Detectives, asked them for a ride to his trailer to change out of his work clothes, and agreed to meet them at the sheriff's office for a second interview. (*Id.* at 435-36). Moreover, Petitioner's testimony corroborated the Detectives' statements that the field interview was conducted "in the open air, outside of the officers' vehicle." (*Id.* at 435). The audio and visual recordings also showed that the initial field interview was "conversational" and the Detectives only removed a knife from Petitioner's pocket for everyone's safety. (*Id.*) Petitioner also voluntarily contacted the Detectives to request a ride to the sheriff's office after he was unable to obtain transportation. (*Id.* at 436).

Likewise, the recording at the sheriff's office interview showed that, before Detectives asked any questions pertaining to the investigation, an "officer read the advisement and waiver of rights aloud as Petitioner read along, initialing acknowledgment of each right and signing the waiver . . . ." (*Id.* at 435).

The state court also found that audio and visual recordings demonstrated zero evidence of intoxication on behalf of Petitioner. (*Id.* at 437). "Petitioner's balance did not appear to be impaired, his speech was clear and articulate, he responded in context to the questions asked, he did not express any confusion as to the questions and he reconstructed in detail his version of the trip to the store with the victim," as well as a detailed narrative of the sexual encounter with A.A. (*Id.*) Further, the video evidence showed Petitioner understood he was admitting to sexual contact with A.A. and not her mother. (*Id.*) The state court thus found Petitioner not credible. (*Id.*)

Accordingly, the state court concluded: (1) Petitioner was not impaired when he made incriminating statements to the Detectives and when he received, acknowledged, and waived his rights; (2) Petitioner was not in custody for *Miranda* purposes; and (3) the facts did not support a motion to suppress Petitioner's incriminating statements. (*Id.* at 438).

In relation to Petitioner's trial counsel's capability, the state court noted that on cross-examination defense counsel elicited facts: (1) challenging A.A.'s and her mother's credibility; and (2) Detectives failed to obtain Petitioner's DNA, photograph Petitioner for marks based on the allegations of aggravated battery, and questioned Petitioner even though Petitioner stated he had been drinking and consuming pain medication. (*Id.* at 439). Further, the court found defense "[c]ounsel's strategy was obviously effective" because Petitioner was acquitted of six (6) of the ten (10) charges. (*Id.* at 440). Defense counsel also employed a "valid strategic decision" regarding trial witnesses that allowed Petitioner to argue that the government did not have any DNA evidence tying him to the crime. (*Id.*)

With respect to the proffered plea agreement, the Court found evidence showed trial counsel explained the benefits of the plea agreement to Petitioner ("if the court imposed the low end of the sentencing range, the Petitioner could be out in thirteen months"). (*Id.* at 441). Moreover, trial counsel's statement to the court that Petitioner was rejecting the plea reasonably conveyed that counsel and Petitioner discussed the plea agreement. (*Id.* at 442). The state court also noted that trial counsel explained several unfavorable facts to Petitioner in a May 6, 2015, letter.[9] (*Id.* at 443). The state court presumed trial counsel was competent and, as any competent attorney would do, conveyed the unfavorable facts to Petitioner when discussing the plea offer.

---

[9] Defense counsel's May 6, 2015, letter stated, in relevant part, "There were several facts that made your case very difficult to defend. Your saliva on [A.A.]'s breasts and neck, the injuries to [A.A.], *i.e.*, the road rash and bruises on her back, her immediate reporting of the rape, and lastly, the torn bra. Please be honest with yourself and acknowledge that perhaps you did not handle yourself too well." (Doc. 21-1 at 149, 443).

11

(*Id.*) Accordingly, the state court found the May 6, 2015, letter undermined Petitioner's assertion that his defense attorney believed and stated that Petitioner could not be convicted without DNA evidence. (*Id.*) The court noted that if that contention were true then trial counsel "would have moved for a directed verdict on the ground that the lack of DNA identification amounted to insufficient evidence . . . ." (*Id.* at 443-44).

The state court also found Petitioner's self-serving statement that he would have accepted the plea was contradicted by Petitioner's own evidence. (*Id.* at 444-45). For instance, defense counsel's letters to Petitioner demonstrated trial counsel repeatedly discussed facts of the case and benefits of accepting a plea. (*Id.* at 445). Plus, Petitioner "remained mute when his attorney informed the court that the Petitioner had turned down the plea offer" at the trial scheduling conference. (*Id.* at 446). Finally, the state court determined that the court would not have accepted a plea based on Petitioner's representations in the habeas corpus proceedings. (*Id.* at 446). For example, the plea conversation with the court would have ceased if Petitioner stated he had never seen or been advised of a plea offer, if Petitioner asserted his innocence or believed another individual was the source of the DNA, or he stated he only accepted the plea because he felt his attorney was not prepared for trial. (*Id.*) More notably, "[t]he court would not have accepted the plea without the DNA analysis first being correctly performed." (*Id.* at 447). The state court ultimately concluded that trial counsel did not render ineffective counsel and denied the habeas petition. (*Id.* at 447-48).

On June 29, 2022, Petitioner signed and deposited for institutional mailing a petition for writ of certiorari to the New Mexico Supreme Court pursuant to Rule 12-501 NMRA. (*Id.* at 449-60). He reiterated his ineffective assistance of counsel claims for (a) failure to investigate, (b) failure to move to suppress DNA evidence, (c) failure to present the State's plea offer, and (d)

failure to move to suppress his confession. (*Id.* at 452-53, 455). Petitioner also raised claims for prosecutorial and judicial misconduct for failure of the prosecutor and judge to explain the plea offer to him as well as the cumulative effect of prosecutorial misconduct. (*Id.* at 454-55). On October 28, 2022, the New Mexico Supreme Court denied the petition. (*Id.* at 461).

## II.    PETITIONER'S § 2254 HABEAS PETITION

On December 5, 2022, Petitioner filed the § 2254 federal habeas petition that is presently before the Court. (Doc. 1). In his *pro se* petition, Petitioner asserted four (4) grounds for relief:

1.    Ground 1: Ineffective Assistance of Counsel

    a)    Trial counsel "prevented [P]etitioner from exercising his constitutional right to testify." (Doc. 1 at 5).

    b)    Trial counsel failed to move to suppress Petitioner's non-Mirandarized statements to law enforcement. (*Id.*).

    c)    Trial counsel advised Petitioner to decline the State's plea offer. (*Id.*)

    d)    Trial counsel failed to investigate Petitioner's defenses and witnesses. (*Id.*)

    e)    Trial counsel failed to call witnesses. (*Id.*)

    f)    Trial counsel failed to call rebuttal expert witness. (*Id.*)

2.    Ground 2: Illegal Conviction

Petitioner asserts his first degree kidnapping conviction was illegal because the New Mexico legislature did not intend to punish for kidnapping when the physical force during the kidnapping was merely incidental to the commission of a separate felony. (*Id.* at 7).

3.    Ground 3: Double Jeopardy

Petitioner contends his convictions for first degree CSP based upon great bodily

harm and aggravated battery violated his right to be free from double jeopardy. (*Id.* at 8).

4. Ground 4: Cumulative Errors

Petitioner argues the cumulative effect of all errors including, but not limited to, fundamental errors and harmless errors, warrant his requested relief. (*See id.* at 10).

On July 7, 2023, the Court ordered Respondents to file an answer addressing the merits of each claim and whether Petitioner had exhausted his state court remedies as to each claim. (Doc. 10). On September 20, 2023, Respondents filed a limited answer in which they contended Petitioner filed a mixed petition containing both exhausted and unexhausted claims. (*See* Doc. 12 at 1, 7–8).

On April 25, 2024, Magistrate Judge Sweazea recommended Petitioner be given an opportunity to voluntarily dismiss his unexhausted claims: sub-claim 1(a) that Petitioner's trial counsel was ineffective for preventing Petitioner from testifying at trial; ground 2 that Petitioner's first degree kidnapping conviction was illegal; and ground 4 that the cumulative effect of all errors including, but not limited to, fundamental errors and harmless errors, warranted relief. (Doc. 15 at 12). Magistrate Judge Sweazea further recommended Petitioner proceed on his remaining claims, all of which were exhausted. (*Id.*) On May 9, 2024, Petitioner voluntarily dismissed his unexhausted claims—sub claim 1(a), ground 2, and ground 4. (Doc. 17).

Subsequently, on June 5, 2024, this Court formally dismissed Petitioner's sub claim 1(a), ground 2, and ground 4 without prejudice and ordered Respondents to file a supplemental answer addressing the merits of Petitioner's exhausted claims: ineffective assistance of counsel (sub claims 1(b)-(f)); and double jeopardy (ground 3). (Doc. 15 at 12); (Doc. 18 at 2).

Thereafter, on July 12, 2024, Respondents filed a supplemental answer. (Doc. 21).

Petitioner did not file a reply.

III.     STANDARD OF REVIEW

The provisions of 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

Death Penalty Act of 1996, 110 Stat. 1214 ("AEDPA"), govern this case. A petition for habeas

corpus under § 2254 attacks the constitutionality of a state prisoner's conviction and continued

detention. A federal court cannot grant habeas relief pursuant to § 2254(d) with respect to any

claim adjudicated on the merits by a state court unless the petitioner's state-court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), there is a two-step inquiry. The threshold question is whether the

applicant seeks to invoke a rule of law that was clearly established by the Supreme Court at the

time the conviction became final. *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011); *see*

*also Williams v. Taylor*, 529 U.S. 362, 390 (2000). If the law was clearly established, then the

court determines whether the state court decision was "contrary to or involved the unreasonable

application of that clearly established federal law." *Byrd*, 645 F.3d at 1165 (quoting *Turrentine v.*

*Mullin*, 390 F.3d 1181, 1189 (10th Cir. 2004)) (internal quotation marks omitted).

The term "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as

opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" Supreme Court

precedent if it "applies a rule that contradicts the governing law set forth in [those] cases." *Id*. at

405. The Supreme Court has interpreted the term "contrary to" as meaning, *inter alia*,

15

"diametrically different" and "opposite in character and nature." *Id.* Therefore, habeas relief under § 2254(d)(1) may be granted only where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003). The state court need not cite applicable Supreme Court cases or even to be aware of such cases, "so long as neither the reasoning nor the result of the state-court decision contradicts [that precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court decision unreasonably applies Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. However, "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court . . . [applied] clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). "Rather, that application must be objectively unreasonable." *Id*. at 76.

Under AEDPA, state court findings of fact are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Accordingly, petitioners challenging a state court's decision based on an unreasonable determination of the facts in light of the evidence presented under § 2254(d)(2) must show by clear and convincing evidence that the determination was factually erroneous. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Lastly, where state courts have adjudicated a claim on its merits, federal courts are limited to reviewing the record as it stood before the state courts. *Cullen v. Pinholster*, 563 U.S. 179, 180-81 (2011) (citing 28 U.S.C. § 2254(d)(1)). In other words, federal courts may not hold evidentiary

16

hearings on claims that the state court decided on their merits. *Id.* at 181; *Littlejohn v. Trammell*, 704 F.3d 817, 857 (10th Cir. 2013). "'Adjudicated on the merits' [means] a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground." *Wilson v. Workman*, 577 F.3d 1284, 1308 (10th Cir. 2009) (internal quotation marks omitted), *overruled on other grounds as recognized in Lott v. Trammell*, 705 F.3d 1167 (10th Cir. 2013). Thus, summary decisions, even those completely devoid of any reasoning at all, can constitute decisions "on the merits" for purposes of AEDPA. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). When the state's highest court offers no explanation for its decision, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

"Even if a state court resolves a claim in a summary fashion with little or no reasoning, [federal courts] owe deference to the state court's result." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003). The Supreme Court has held that the standard is "highly deferential" to state courts and "difficult to meet," as it "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington*, 562 U.S. at 101; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)); *see also Black v. Workman*, 682 F.3d 880, 891 (10th Cir. 2012) ("Under [AEDPA,] a federal court in a § 2254 proceeding must be exquisitely deferential to the state court's resolution of the [petitioner's] claims.").

Because Petitioner proceeds *pro se*, the Court must liberally construe his pleadings, but the Court cannot assume the role of advocate on his behalf. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

IV.     ANALYSIS

17

Whether Petitioner will prevail depends on his ability to demonstrate that the state court's decision was based on an unreasonable application of federal law or an unreasonable finding of fact. As stated above, however, that standard is incredibly difficult to satisfy and for good reason. State courts are entrusted with the same responsibility to protect constitutional rights as federal courts, and consistent with the principle of equal sovereignty, they are presumed competent to do so. Their fact-finding is also presumptively sound. Only when a petitioner demonstrates there is no possibility of fair minded disagreement may a federal court find that a state court applied federal law unreasonably or made an unreasonable finding of fact.

As a preliminary matter, the Court finds that Petitioner has not met his burden of demonstrating that the state court applied federal law unreasonably or made an unreasonable finding of fact. Petitioner's Habeas Petition is absent of any argument, factual allegations, specificity or legal argument to support any of his claims. *See* (Doc. 1). A court must liberally construe the pleadings of a *pro se* litigant. *Hall*, 935 F.2d at 1110. However, to obtain federal habeas relief, even a *pro se* petitioner must allege sufficient facts showing that he is in custody in violation of the Constitution, laws, or treaties of the United States. *See id.* (noting that "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based"); *see also Ruark v. Gunter*, 958 F.2d 318, 319 (10th Cir. 1992) (noting that "naked allegations" in habeas petitions are insufficient to state cognizable habeas claims); Rule 2(c)(3), Rules Governing Section 2254 Cases in the United States District Courts (requiring habeas petitioner to "state the facts supporting each ground" for habeas relief). Because the Court cannot "reasonably read" Petitioner's claims 1(b)-(f) and 3 of the petition "to state a valid claim on which [Petitioner] could prevail," *Hall*, 935 F.2d at 1110, the Court finds the Habeas Petition may be dismissed on this basis alone. Nevertheless, the Court shall proceed with its analysis of the merits

18

of Petitioner's Habeas Petition.

**A.    <u>Petitioner's Claims for Ineffective Assistance of Counsel are Insufficient to Warrant Habeas Relief</u>**

In his first ground for relief, Petitioner asserts that his counsel provided him ineffective assistance of counsel. (Doc. 1 at 5). Petitioner raised this claim over the course of his state post-conviction filings. (*See generally* Doc. 21-1 at 23-25, 32-46, 56-79, 120-29, 167-72, 452-53, 455). In the Habeas Petition, Petitioner contends his counsel provided him ineffective assistance by: (1) failing to move to suppress Petitioner's non-Mirandarized statements to the Detectives; (2) advising him to decline the plea agreement, which Petitioner claims he would have accepted; (3) failing "to investigate defenses, witnesses . . . call witnesses" and expert rebuttal witnesses. (Doc. 1 at 5). Respondents contend Petitioner's claims fail because he does not point to any errors in the state court's decision nor does he proffer clear and convincing evidence to overcome the presumption of the state court's factual findings. (Doc. 21 at 18). The Court denies the requested relief as to each of these claims for the reasons stated herein.

It is well established that defendants have a Sixth Amendment right to effective counsel. *See Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Accordingly, the Supreme Court in *Strickland* devised a two-step inquiry to determine whether a lawyer's poor performance deprived an accused of his Sixth Amendment right to assistance of counsel. *Id.* at 686–87. In order to establish an ineffective assistance claim, a movant must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." *Id.* at 687–88.

19

Under the first prong, "the performance inquiry must be whether counsel's assistance was reasonable considering all circumstances." *Id.* at 688. However, review of an attorney's performance "must be highly deferential," and the court must "evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Indeed, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (citation omitted). The question to determine deficient performance "is whether [the] representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Simpson v. Carpenter*, 912 F.3d 542, 593 (10th Cir. 2018) (citing *Harrington*, 562 U.S. at 105).

The inquiry does not stop there; rather, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Under the second prong of the inquiry, the movant must establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* Courts may analyze either prong first and need only address one prong if the movant fails to make a sufficient showing on that prong. *Id.* at 697.

When an ineffective assistance of counsel claim comes to the Court by way of a § 2254 petition, the petitioner faces an even more difficult burden to show that the state court's decision to deny his ineffective assistance of counsel claim was contrary to or an unreasonable application of clearly established federal law. *See Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 742 (10th Cir. 2016) (holding that a review of ineffective assistance of counsel claims in the context of a § 2254 petition are "doubly deferential in that [the court] take[s] a highly deferential look at counsel's

performance [under Strickland] through the deferential lens of § 2254(d)"); *Byrd*, 645 F.3d at 1168 ("[W]hen assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, [the court] defer[s] to the state court's determination that counsel's performance was not deficient, and further, defer[s] to the attorney's decision in how best to represent a client." (internal citation omitted)).

> i.    Petitioner has not shown that trial counsel was ineffective for failing to move to suppress his incriminating statements

Petitioner first claims trial counsel rendered ineffective assistance by failing to move to suppress his confessions because the statements were obtained in violation of constitutional rights as interpreted in *Miranda v. Arizona*, 384 U.S. 436 (1996). (Doc. 1 at 5); *see also* (Doc. 21-1 at 162-72, 291, 295). Petitioner makes two arguments to support this claim. First, the officers should have advised him of his rights, as required by *Miranda*, because he was in custody during the interviews. (Doc. 21-1 at 162-72, 291, 295). Second, his statements were involuntary because he was intoxicated after consuming alcohol and prescription medication. (*Id.* at 162-72, 291, 295).

Respondents assert Petitioner was not sufficiently prejudiced by trial counsel's decision to not seek suppression, because even if counsel had done so, the confession would not have been suppressed. (Doc. 21 at 14-18).

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. The Supreme Court has interpreted this to mean the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 445. An

individual may waive this privilege only "voluntarily, knowingly, and intelligently." *Id.* at 444. For the waiver to be made knowingly and intelligently, the individual must have made it "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Colo. v. Spring*, 479 U.S. 412, 421 (1986). Further, "[a] statement is involuntary in violation of due process if a defendant's will was overborne by the circumstances surrounding his confession." *United States v. Lamy*, 521 F.3d 1257, 1261 (10th Cir. 2008) (internal quotations omitted). Coercive police activity is a "necessary predicate" to finding a *Miranda* waiver involuntary. *Colo. v. Connelly*, 479 U.S. 157, 167 (1986).

*Miranda* "applies only in the context of custodial interrogation." *Montejo v. La.*, 556 U.S. 778, 795 (2009). If the defendant is not in custody *Miranda* and its progeny "do not apply; nor do they govern other, noninterrogative types of interactions between the defendant and the State." *Id.* This is because noncustodial and noninterrogative situations "are the *least* likely to pose a risk of coerced waivers." *Id.* "When a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering." Moreover, "noninterrogative interactions with the State do not involve the inherently compelling pressures that one might reasonably fear could lead to involuntary waivers." *Id.* (internal quotation marks and citation omitted); *see Miranda*, 384 U.S. at 467.

An interrogation is custodial if it includes "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 445. The custody requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420 (1984). Courts consider: (1) "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will;" (2) the nature of

the questioning, including whether prolonged accusatory questioning created a coercive environment; and (3) whether the law-enforcement agents dominated the encounter. *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

As the state court determined, the record contradicts Petitioner's assertion he was "in custody" when he made incriminating statements. The state court found the initial field interview commenced when Petitioner was on horseback in an open pasture. (*Id.* at 435). The interview was conducted outside of the Detectives' vehicle. (*Id.*) The recordings further demonstrated that the Detectives were not "real rough . . . like they were trying to pick a fight" as Petitioner alleged. The state court found the interaction occurred "in a conversational manner." (*Id.* at 435). Neither Detective was "rough" as they informed Petitioner they were going to remove a knife from his front pocket for everyone's safety. (*Id.* at 214-15, 435); (Doc. 22-1 at 18); (Doc. 23-1 at 173). The Detectives also sought Petitioner's permission to review the contents of his cell phone, which they returned to him after concluding the field interview. (Doc. 21-1 at 435). And, when Petitioner made an incriminating statement, he was notified that he was not under arrest and the *Miranda* warning was given. (*Id.*) Detective Harris then asked if Petitioner if he was "willing to continue the conversation" to which Petitioner replied, "[w]e can talk." (*Id.* at 242-43, 434-45). Detectives asked Petitioner to meet them at the sheriff's office for a second interview and agreed to let Petitioner drive himself. (*Id.* at 243-46, 250-51); (Doc. 23-1 at 173-74). Petitioner then voluntarily contacted the Detectives to request a ride to their office. (Doc. 21-1 at 251). Once they arrived at the sheriff's office, Petitioner was once again read his *Miranda* rights before the Detectives asked any questions. (*Id.* at 251-52, 434-45). Petitioner confirmed he understood his rights and waived those rights. (*Id.* at 252). Thereafter, Petitioner reiterated the statement he made to the Detectives previously at the ranch. Specifically, he admitted to having sexual encounters with A.A. and that

23

he had doubts as to whether she was 18 years old. (*Id.* at 261-64).

In addition, nothing in the record shows Petitioner's *Miranda* waivers were not knowing, intelligent, or voluntary. At the evidentiary hearing, Detective Harris stated based on his "several thousand" interactions with intoxicated individuals in his career he would have noticed if Petitioner was inebriated. (Doc. 22-1 at 79-80). Moreover, he would not have allowed Petitioner to drive to the sheriff's office for the second interview if he thought Petitioner exhibited any signs of intoxication. (Doc. 21-1 at 436); (Doc. 22-1 at 79-80). Detective Harris also observed Petitioner's eyes were not dilated and his speech was not slurred. (Doc. 21-1 at 436); (Doc. 22-1 at 83-84, 87). He further testified that he was so close to Petitioner during the field interview that his recorder picked up Petitioner's voice and, in that close proximity, he did could not smell any odor of alcohol. (Doc. 21-1 at 436); (Doc. 22-1 at 83). He also did not smell any alcohol on Petitioner during the transfer to the sheriff's office. (Doc. 21-1 at 436); (Doc. 22-1 at 83-84). Detective Harris also testified that Petitioner never left the room at the sheriff's office, he never witnessed Petitioner take any medications or consume alcohol. (Doc. 21-1 at 436); (Doc. 22-1 at 86-90).

And, as noted above, Petitioner agreed to continue speaking to the Detectives after being read his *Miranda* rights. (Doc. 21-1 at 242-43, 251-52, 434-45). Petitioner described in specific detail the events from the night before. (*Id.* at 215-38). For instance, he recalled A.A. and Paula meeting him at the ranch to help clean his trailer, (*id.* at 258), setting up his generator for the trailer with A.A., (*id.* at 258-59), the route he and A.A. took to and from the store, (*id.* at 224), that A.A. initiated the sexual encounter, where it took place, and how long it lasted, (*id.* at 261-62), and that he and A.A. laid on the ground to inspect the undercarriage of the truck when he thought he heard something underneath the vehicle, (*id.* at 265).

Even if Petitioner were intoxicated, as he argues, he would have needed to be not merely

24

intoxicated but "impaired to a substantial degree [by drugs or alcohol] to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination." *See United States. v. Burson*, 531 F.3d 1254, 1256-57 (10th Cir. 2008). The state court noted the audio and visual recordings of the interviews demonstrated Petitioner was "clearly enunciating his responses," "responded appropriately" to the Detectives inquiries, balance was not impaired, did not express confusion, and recounted the events of the incident with detail. (Doc. 21-1 at 437). The totality of circumstances in the record show Petitioner was alert and responsive. *Burson*, 531 F.3d at 1256-57 (considering a totality of the circumstances in determining whether a person knowingly and intelligently waived his *Miranda* rights).

The record further shows Petitioner's *Miranda* waiver was voluntary. Despite Petitioner's argument otherwise, the Detectives did not coerce Petitioner's waiver and subsequent confession by being "rough." *See also Connelly*, 479 U.S. at 167, 170. Detective Harris read Plaintiff his *Miranda* rights twice. (*Id.* at 242-43, 251-52, 434-45). He advised Petitioner he was not under arrest. (*Id.* at 242-43, 434-45). He asked Petitioner if he would be willing to continue the interview at the station. (*Id.* at 242-43, 434-45). And each time he read Plaintiff his rights, he confirmed Petitioner understood his rights, and confirmed Petitioner was willing to speak with him. (*Id.* at 242-43, 251-52, 434-45). Petitioner's statements in the two separate interviews were also identical. (*Id.* at 437-38).

Given the totality of the circumstances, the Court concludes the evidence supports the state court's determination that Petitioner was not in custody at the time of his statements to law enforcement and his statements were made knowingly, intelligently, and voluntarily. Petitioner has not demonstrated that the state court's determination was contrary to clearly established federal law or based on an unreasonable determination of the facts. The Court thus finds Petitioner has not

established that he is entitled to federal habeas relief on this issue. *See* 28 U.S.C. § 2254(d)(1), (2)).

ii.      <u>Petitioner has not rebutted the presumption of correctness of the state court</u>

<u>by clear and convincing evidence as it pertains to the plea offer</u>

Petitioner contends that his trial counsel advised him to reject the State's plea offer. (Doc. 1 at 5). In his state habeas corpus petition, Petitioner alleged counsel told him he could not be found guilty because the lab report identified a different person as the suspect. (Doc. 21-1 at 167, 171); *see also* (Doc. 22-1 at 37-38). Substantial evidence contradicts Plaintiff's allegation.

The Sixth Amendment applies to representation during the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). To establish ineffective assistance based on the rejection of a plea agreement,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

At the evidentiary hearing, Petitioner testified that prior to trial defense counsel told him the State had "no case against [him]" because the suspect listed on the crime laboratory report was identified as "Dominic." (Doc. 22-1 at 38). Petitioner also testified that he would have accepted a plea offer if trial counsel had advised him that he could be convicted without DNA evidence. (*Id.* at 38-39). The state court, however, found trial counsel's emails to Petitioner showed counsel communicated the benefits of accepting the plea offer and advised him of unfavorable facts against him prior to trial. (Doc. 21-1 at 441-43). Moreover, when assessing *Lafler* prejudice, the state court

26

concluded that it could not accept a guilty plea unless the State provided a "valid DNA test" showing the DNA on A.A. belonged to Petitioner. (Doc. 22-1 at 146-47). Thus, nothing indicates that the state court would have agreed to a plea agreement. *See Lafler*, 566 U.S. at 164.

The state court also concluded Petitioner's evidence and testimony belied his self-serving statement that he would have accepted the plea offer. First, contrary to Plaintiff's representation, trial counsel's email indicated he spoke to Petitioner regarding the benefits of the plea offer prior to trial. (Doc. 21-1 at 441) ("if the court imposed the low end of the sentencing range, the Petitioner could be out in thirteen months"). Second, Petitioner "remained mute" at the trial scheduling conference when his counsel informed the court that Petitioner rejected the plea offer. (*Id.* at 446). The state court presumed that an individual would not stay silent if he had no knowledge of the plea offer or wanted to take it. (*Id.*) Third, the trial court would have ceased the plea conversation if Petitioner maintained that he never saw nor was advised of a plea offer, asserted his innocence or believed another individual was the source of the DNA, or he merely accepted the plea offer to "get it over with." (*Id.*) And, contrary to Plaintiff's representations, the state court found trial counsel would have moved for directed verdict on the basis of lack of DNA. (*Id.*)

The issue of whether counsel advised Petitioner about the advantages and disadvantages of a plea offer is a factual question. A federal court must presume the correctness of a state court factual determination. 28 U.S.C. § 2254(e)(1); *see also Marshall*, 459 U.S. at 434 ("§ 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Habeas relief is therefore denied because Petitioner failed to carry his "burden of rebutting the presumption of correctness by clear and convincing evidence." *See Brumfield v. Cain*, 576 U.S. 305, 322 (2015).

        iii.        <u>Petitioner has not met his burden to establish counsel was ineffective for</u>

27

<u>failing to investigate defenses, witnesses, and to call witnesses and expert</u>

<u>rebuttal witnesses</u>

Without citation to legal authority or the record and without any analysis, Petitioner claims trial counsel was also ineffective for failing "to investigate defenses, witnesses . . . call witnesses" and expert rebuttal witnesses. (Doc. 1 at 5). As Respondents contend, these allegations are insufficiently specific or concrete to merit review or relief. *See Quintana v. Mulheron*, 788 F. App'x 604, 609 (10th Cir. 2019) ("We have repeatedly held that conclusory allegations are insufficient to warrant habeas relief for ineffective assistance of counsel."); *see also* (Doc. 21 at 18-19). Petitioner has not provided legal or factual support for these assertions. Nor has he articulated how counsel's alleged errors were objectively unreasonable or how the result of the proceedings would have been different bur for the alleged errors. *See* (Doc. 1 at 5). Moreover, most of these allegations fall squarely within the ambit of decisions related to trial tactics, for which trial counsel enjoys a presumption of sound trial strategy. *See Harrington*, 562 U.S. at 107 ("[C]ounsel [are] entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); *see also Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client the same way.").

As Petitioner has not even attempted to meet either prong of the *Strickland* analysis with regard to these ineffective assistance of counsel claims, the Court concludes that they cannot serve the basis for federal habeas relief. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 n.1 (10th Cir. 2005) (acknowledging that while *pro se* pleadings are liberally construed, courts will not "make arguments for pro se litigants or otherwise advocate on their behalf.").

Notwithstanding, the state court found it was reasonable for trial counsel to pursue a

strategy that the State could not prove beyond a reasonable doubt that Petitioner committed the offense of CSP. The state court found "counsel thoroughly challenged" A.A.'s and her mother's credibility. (Doc. 21-1 at 439). On cross-examination, he questioned A.A. about seeing a man named Ramon at the store and, through his line of questioning, suggested Ramon followed A.A. back to the ranch. (*Id.*) Defense counsel further established that Detective Espinosa failed to: (1) secure a DNA sample from Petitioner; (2) photograph Petitioner to document whether he had any markings on his body that may corroborate A.A.'s allegations; and (3) establish Petitioner was of sound mind to continue being questioned after Petitioner informed the Detectives he had been drinking and consumed OxyContin. (*Id.*) Trial counsel also elicited testimony from Nurse Acree that she could not opine on whether A.A. "was definitely sexually assaulted" or that the injuries were "consistent with rape." (*Id.* at 264-65). As a result of defense counsel's "effective" strategy, Petitioner was acquitted of five of the six counts of first-degree CSP—and acquitted on a total of six out of ten counts. (Doc. 21-1 at 439).

Petitioner thus fails to show that trial counsel's strategy decisions were unsound. *See also Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir. 2002) (noting that the defendant has the burden to show "that counsel's action or inaction was not based on a valid strategic choice") (citations omitted). Petitioner fails to overcome the presumption that his trial counsel exercised reasonable professional judgment when deciding which defenses and witnesses warranted further interviews, investigation, and/or consultation. Accordingly, he has not shown that every fair-minded judge would agree that trial counsel acted unreasonably.

Turning to the second *Strickland* prong, Petitioner also fails to show the requisite prejudice given the highly speculative nature of his contention and the evidence against him. *Cf. Boyle v. McKune*, 544 F.3d 1132, 1138-39 (10th Cir. 2008) (concluding that, even assuming counsel was

deficient in failing to call medical expert witness, petitioner had not shown prejudice because of highly speculative nature of what testimony expert witness would provide the defense and weight of evidence against him). Petitioner failed to show a reasonable probability that, but for trial counsel's failure to investigate defenses or witnesses, or call expert witnesses, the result of the proceeding would have been different. *See Cullen*, 563 U.S. at 189. Because he has not shown that every fair-minded jurist would find *Strickland* prejudice, Petitioner is not entitled to habeas relief on this ground.

### B.      Petitioner Has Not Demonstrated a Violation of Double Jeopardy

Petitioner's remaining habeas claim is that the trial court failed to merge his convictions for kidnapping and CSP, in violation of the Double Jeopardy Clause. (Doc. 1 at 8). Petitioner contends double jeopardy is implicated "[b]ecause the force used to perpetuate the kidnapping [was] the same force used to enhance the CSP offense to first degree felony." (*Id.*). Respondents assert Petitioner's conduct, as testified to by A.A., was not unitary and, hence, double jeopardy is not implicated. (Doc. 21 at 26-27).

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Va.*, 443 U.S. 307, 318 (1979). The inquiry, however, does not concern whether the reviewing court itself believes the evidence established guilt or the logic by which the trier of fact reached its conclusion. *See id.* at 318-19; *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citation omitted).

30

"[T]he Fifth Amendment guarantee against double jeopardy . . . protects against multiple punishments for the same offense." *N.C. v. Pearce*, 395 U.S. 711, 717 (1969) (overruled on other grounds by *Ala. v. Smith*, 490 U.S. 794 (1989)). "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (citation omitted). To make that determination, a federal habeas court must "defer to the state court's interpretation of the relevant statutory provisions." *Lucero v. Kerby*, 133 F.3d 1299, 1316 (10th Cir. 1998) (citations omitted). New Mexico uses the following two-part test to determine legislative intent:

> The first part of our inquiry asks the question that Supreme Court precedents assume to be true: whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes. The second part focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial.

*Swafford v. N.M.*, 810 P.2d 1223, 1233 (N.M. 1991). Determining whether two events are separate offenses depends on the time and space between the events and "the quality and nature of the acts or . . . the objects and results involved." *Id.* at 1234 (citation omitted). However, "if the conduct is separate and distinct, inquiry is at an end." *Id.*; *see also N.M. v. Silvas*, 343 P.3d 616, 619 (N.M. 2015) ("If the conduct is not unitary, the analysis ends and double jeopardy does not apply.") (citation omitted).

Here, Petitioner committed the crimes of kidnapping and CSP at different times. With respect to kidnapping, a reasonable jury could have found that Petitioner used deception to kidnap A.A. by luring her into his vehicle under the pretense of going to the store for gasoline. The

31

kidnapping was complete, however, once Petitioner began driving in the wrong direction with the intent to commit CSP. *See State v. McGuire*, 795 P.2d 996, 1000 (N.M. 1990). In regard to CSP, the jury could have concluded that CSP occurred at a different location and sometime after the kidnapping. Specifically, Petitioner committed CSP when he first forced A.A. to engage in vaginal intercourse after she fell out of the vehicle. Thus the conduct underlying the kidnapping by deception and the CSP was not unitary because the conduct was separated by time and distance. *See Swafford*, 810 P.2d at 1234 (to determine whether conduct was unitary, courts should consider whether illegal acts were separated by time or distance, as well as the quality and nature of the acts). A reasonable jury could have also found that the kidnapping resumed when Petitioner forced A.A. back into the vehicle. *See State v. Bahney*, 274 P.3d 134 (N.M. Ct. App. 2012) (finding kidnapping is a continuing crime until the victim is released). Per A.A.'s testimony, Petitioner repeatedly beat and sexually assaulted her in the vehicle, resulting in CSP over multiple occasions. Under this scenario, the conduct underlying the two offenses was not unitary because the force used to accomplish the kidnapping (forcing her into the truck), and the force used to accomplish CSP (hitting her and pulling her hair), were not similar. *See McGuire*, 795 P.2d at 999; *State v. Crain*, 946 P.2d 1095, 1100-01 (N.M. Ct. App. 1997). Accordingly, based on the sufficient evidence established at trial, the jury reasonably could have found "individual factual bases" for each offense. *Swafford*, 810 P.2d at 1234. The Court thus finds that Petitioner failed to demonstrate that he is entitled to habeas corpus relief as to his double jeopardy claim.

## V.    CERTIFICATE OF APPEALABILITY

Lastly, the Court addresses whether Petitioner is entitled to a certificate of appealability. No appeal may be taken from a "final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court" unless the petitioner first obtains a

certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). A certificate of appealability may be issued only if Petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As set forth above, Petitioner has failed to make this showing. The Court, accordingly, denies Petitioner a certificate of appealability.

## VI.   CONCLUSION

For the foregoing reasons, the Court denies Petitioner's Habeas Petition with prejudice and denies a certificate of appealability.

**IT IS ORDERED** that:

1. Petitioner Joseph B. Water's Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus, filed December 5, 2022, (Doc. 1), is **DENIED WITH PREJUDICE**;

2. A Certificate of Appealability is **DENIED**; and

3. A Final Judgment shall be entered concurrently herewith disposing of the civil habeas case.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE